[No. 18122. *En Banc.* October 30, 1923.]

KATE M. BARR, *as Administratrix of the Estate of* BENJAMIN N. BARR, *Deceased, Appellant,* v. COWLITZ COUNTY, *Respondent.*[1]

BRIDGES (1)—CONSTRUCTION AND MAINTENANCE—STATUTES. A county may legally acquire a bridge, wholly within a city, under a contract with the city, pursuant to Rem. Comp. Stat., § 6516, providing that counties and cities are authorized to join in paying for the construction of any bridge which is a connection between any street or county road, where the stream is partly within the city.

SAME (1). Under Rem. Comp. Stat., § 6524, authorizing a city and county to join in the construction, operation and maintenance of any bridge "*within* or constituting the boundary line of the state or any county," in connection with Id., § 6535, authorizing a county and city to jointly construct a bridge within or partly within the city, the authority is not limited to bridges over boundary line streams, and a county is liable for its negligence in the maintenance of such a bridge wholly within a city pursuant to the terms of its contract with the city to maintain the same.

SAME (1). The irregularity in the proceedings by which a county acquires and maintains a bridge is no defense to its liability for negligence in maintaining it.

SAME (1). The act of 1860, Rem. Comp. Stat., § 6521, providing that the county's power to control bridges shall not extend to bridges within the limits of a city, has been modified by subsequent

[1]Reported in 220 Pac. 6.

legislation, Id., §§ 6524, 6535, relating to the joint construction and maintenance of bridges by cities and counties.

SAME (1). There is nothing in the general powers of cities of the third class in Rem. Comp. Stat., § 9127, which militates against the power of such cities to construct and maintain bridges jointly with a county.

SAME (1). There is nothing in Rem. Comp. Stat., §§ 6413-6416, relating to the levy and expenditure of revenues for the construction and maintenance of bridges which would prevent a city and county from jointly constructing and maintaining a bridge, under Id., §§ 6524-6535.

MITCHELL and HOLCOMB, JJ., dissent.

Appeal from a judgment of the superior court for Cowlitz county, Reynolds, J., entered July 13, 1922, dismissing an action for wrongful death, upon sustaining a demurrer to the complaint. Reversed.

*Miller, Wilkinson & Miller* and *W. F. Magill,* for appellant.

*Hite Imus, A. H. Imus, Fisk & McCarthy,* and *Hayden, Langhorne & Metzger,* for respondent.

PARKER, J.—The plaintiff, Mrs. Barr, as administratrix of the estate of her deceased husband, seeks recovery of damages from Cowlitz county and the city of Kelso for his death, alleged to have resulted from the negligence of the county and city in the maintenance of a defective bridge over the Cowlitz river, within that county and city, which bridge collapsed while her husband was driving over it in an automobile, thereby causing his death. The county demurred to Mrs. Barr's amended complaint, upon the ground that no cause of action was stated therein as against the county, and especially upon the ground, in substance, that the bridge was situated wholly within the city and therefore was completely beyond the legal power or duty of the county to have part in its acquisition, maintenance or control, so as to render the

county liable for any injuries resulting from its collapse. The demurrer was sustained by the superior court, and Mrs. Barr electing to stand upon her amended complaint and not plead further, judgment of dismissal was rendered against her and in favor of the county, from which she has appealed to this court.

After alleging the appointment and qualification of Mrs. Barr as administratrix of her husband's estate, and the corporate existence of the city of Kelso as a city of the third class in Cowlitz county, the complaint continues:

"That prior to the 9th day of September, A. D. 1909, a private corporation had constructed and was maintaining within the city limits of Kelso, Cowlitz county, Washington, a bridge across the Cowlitz river, said bridge connecting on the east approach with Allen street in said city of Kelso and extending westerly across the Cowlitz river, a navigable stream, said street on the west side of the river connecting with other streets of the city of Kelso and said streets connecting at the city limits of said city with improved public roads constructed along main lines of travel beginning at said city of Kelso, a trade center, and extending to the northerly, southerly and westerly portions of Cowlitz county; that on said 9th day of September, A. D. 1909, the defendant Cowlitz county, acting jointly with the city of Kelso, purchased said bridge, at which time it connected with certain streets of the city of Kelso on the east and on the west side of said river, and at either end formed connections with improved public roads constructed along main lines of travel beginning at the city limits of said city of Kelso, a trade center, and extending in northerly, easterly, southerly and westerly directions, and formed the only means of travel across said river within said city of Kelso, and formed the only road connection between the southerly portions of said Cowlitz county lying west of the Cowlitz river and the part on the east side of said river in the vicinity of Kelso; that the county of Cowlitz paid as its share of the purchase

price of said bridge the sum of $22,500, and the city of
Kelso paid as its share the sum of $2,500 and the said
bridge thereupon became the property of and was
jointly owned by these defendants, and it was so under-
stood and intended, and with the consent and by agree-
ment with said city of Kelso, the legal title of said
bridge was taken by and in the name of said Cowlitz
county, and said county thereupon assumed ownership
and control thereof, and has continued to exercise
ownership and control thereof from said date of pur-
chase until its collapse on January 3rd, A. D. 1923;
that immediately upon its purchase the county took
possession and control of said bridge and thereafter
continuously until its collapse on January 3rd, A. D.
1923, said county operated and maintained said bridge
as a public bridge, open to the public as a public high-
way, and from time to time expended public funds
thereon for its maintenance and repair, and continu-
ously and until its collapse as herein alleged, main-
tained on said bridge employees to attend and operate
the lift or draw-span of said bridge, and exercised
control and ownership of said bridge in the same man-
ner and to the same extent as over bridges located
within said Cowlitz county outside of the city limits of
the city of Kelso; that at the time said bridge was pur-
chased by said Cowlitz county and the city of Kelso,
the city of Kelso agreed with Cowlitz county that
Cowlitz county and the city of Kelso should acquire
and jointly own said bridge, and that the same should
be maintained, controlled and operated by Cowlitz
county, and the said city of Kelso has continuously
and until its collapse on the 3rd day of January, A. D.
1923, concurred and agreed that said bridge should be
jointly owned by Cowlitz county and the city of Kelso
and should be controlled, maintained and operated by
Cowlitz county, and said Cowlitz county acquired joint
ownership of said bridge and has assumed to main-
tain, control and operate the same, and did maintain,
control and operate the same until its collapse on the
3rd day of January, A. D. 1923, and has continued to
jointly own said bridge and has assumed the control
and management and the obligation to keep the bridge

in proper state of repair and has been in active and actual control of the same; that during the year 1917 said bridge by reason of its age and use by the public had become weak and unsafe for public use, and the defendant Cowlitz county reconstructed said bridge expending therefor large sums of public funds; that in the reconstruction of the bridge the old piling forming the piers and supports of the bridge were used and not replaced by new piling and new supports; that at said time the piling had been in use since 1907 and had become old, rotten and of insufficient strength to support the new bridge as rebuilt by the defendant Cowlitz county, and, further, that in the reconstruction of the said bridge said Cowlitz county used the old anchorage cables which had been in place and in the ground since 1905 covered by the earth and unprotected from corrosion, and had become corroded, weak and of insufficient strength, and in such reconstruction the said defendant Cowlitz county permitted said anchorage cables to remain unprotected from corrosion and permitted the cables to continue to deteriorate, corrode and become weak and of insufficient strength to support and carry the load and weight of the bridge, until they broke causing said bridge to collapse on the 3rd day of January, A. D. 1923.''

Then follows further detailed allegations of negligence on the part of the county in the maintenance and reconstruction of the bridge; the collapse of the bridge as the result of the county's negligence in such maintenance and construction; the death of Mr. Barr in the collapse of the bridge, while driving across it in January, 1923; and the damages resulting to Mrs. Barr, his widow, and their minor son. Since the contentions here made by respective counsel in behalf of Mrs. Barr and the county have to do only with the question of the powers and duties of the county with respect to the proper and safe maintenance of the bridge and the question of the county's liability for injuries resulting from its unsafe maintenance of the bridge to persons

using it as a highway, a further review of the facts alleged in the complaint is unnecessary.

It is contended by counsel for the county, and the learned trial judge seemingly agrees with them, in substance, that, because the bridge was wholly within the city, the alleged assumption of the powers and duties of the county with reference to its acquisition, reconstruction and maintenance was wholly *ultra vires* and so far beyond the legal powers and duties of the county that it cannot be held liable for any negligence resulting from the collapse of the bridge and the death of Mr. Barr, even though the negligence causing such result be of persons who were the county's legal agents with respect to the acquisition and maintenance by the county of highways and bridges. Some of the early statutes of the territory and state do seem to lend support to this contention; but it seems to us that counsel for the county and the learned trial judge have overlooked the full force and effect of more recent legislation upon this subject. Section 6516, Rem. Comp. Stat. [P. C. § 534], being chapter 70 of the Laws of 1901, p. 120, as amended by chapter 96 of the Laws of 1909, p. 229, provides:

"Any county within the state of Washington, by and through its county commissioners, and any city or town, by and through its legislative body [and the state of Washington], or any two of such bodies, be, and they are hereby authorized to join in paying for the construction of any bridge, trestle, or any structure which crosses any stream or body of water, when such bridge is a connection between any street or county road, or is a connection between any streets that form connections with county roads, when such stream or body of water is within or partly within such city or town: . . ."

This was the law when the county joined with the city in acquiring the bridge, and seems to us to leave

little room for arguing that such acquisition by the county was illegal in so far as it contributed funds to aid in paying the purchase price of the bridge. This particular act of 1909 may leave some doubt as to the county's power and duty with reference to the maintenance and control of the bridge after its acquisition, but that is a matter which we think is set at rest by still later legislation. In 1913, the legislature passed,

"An Act relating to the purchase, construction, maintenance, control and operation of bridges in this state and between this state and adjoining states, counties, cities and towns, and providing for the cooperation of the said counties, cities and towns in this state with each other and with the United States, or adjoining states or the counties, cities or towns therein, in the purchase, construction, maintenance, control and operation of the same;"

being ch. 56, Laws of 1913, p. 168, and §§ 6524-6539 inclusive, Rem. Comp. Stat. [P. C. § 538 *et seq.*] The first section of that act, being § 6524, Rem. Comp. Stat., reads:

"*The state of Washington and all counties, cities and towns within the state are hereby authorized and empowered to join with each other* or to aid the state of Washington, the federal government, or any adjoining county, city or town in this state, or to jointly or separately join with any adjoining state, county, city or town *in the purchase, construction, control, operation and maintenance of any bridge or bridges over or across any river, stream or body of water being within* or constituting the boundary line of the state or of *any county therein.*"

We italicize the words to be particularly noticed. Counsel for the county seem to view this law as having application only to strictly interstate, inter-county, inter-city, or inter-city and county bridges; that is, bridges over streams consisting of state, county or city boundary lines, and not to bridges wholly within

a city, or wholly within a county outside the corporate limits of a city therein. We think the above quoted language negatives any such narrow meaning of the section, as is further evidenced by the language of § 6535, reading as follows:

"That whenever it is deemed advisable by the common council of any city or town and the county commissioners of any county in this state to purchase or construct a bridge *within or partly within such city* or town, the council and commissioners are authorized and empowered to enter into an agreement for the construction of such bridge, upon such terms as may be mutually agreed upon, each contributing such sum toward the purchase or construction of the same as may be determined to be just and proper, and enter into contract for the construction of such bridge and to spend public funds thereon, . . ."

We italicize the words to be particularly noticed. These considerations, it seems to us, show a legislative intent to confer upon cities and counties joint power, not only to contribute funds toward the acquisition of a bridge of the nature here in question, wholly within the limits of a city, but also a legislative intent to confer power upon cities and counties jointly to "join with each other . . . in the . . . control, operation and maintenance" of any such bridge. Observations made in our decision in *Rands v. Clarke County,* 79 Wash. 152, 139 Pac. 1090, lend some support to this conclusion.

Contention is made in behalf of the county rested upon alleged irregularities and want of proper procedure on the part of the county in acquiring an interest in the bridge, and also upon the alleged want of power by the county in doing more than merely contributing towards the purchase price of the bridge at the time of the acquisition of the bridge by the city and county; it being pointed out that, by the provisions of

§ 6516 [P. C. § 534], above quoted, the county was not, in terms, given power beyond that of merely contributing funds towards the acquisition of such a bridge. In this connection, let us be reminded that the county had physical possession of the bridge and was physically maintaining and controlling it at the time it was given the power so to do in 1913 by the legislature as provided in §§ 6524, 6535 [P. C. §§ 538, 548], above quoted. Now let us concede for argument's sake that the county's power of acquiring a controlling interest in the bridge in 1909, beyond its mere contribution of funds, was then doubtful under the provisions of § 6516 [P. C. § 534], then in force, in that, by the terms of that section, the county was authorized seemingly, in terms, only to join in paying for the acquisition of the bridge; and let us also concede for argument's sake that when the act of 1913 (Laws of 1913, p. 168) was passed, from which §§ 6524 and 6535 [P. C. §§ 538, 548] are quoted above, the county's then and thereafter assumption of an interest in and control of the bridge was irregular, and not done by prescribed legal methods. Still the fact remains that the county did physically acquire the bridge in 1909 before the passage of the act of 1913, and has ever since then continuously physically maintained and controlled it as a part of the public highways of the county for the benefit of the people of the whole county.

It has become well settled law in this state that the question of the regularity of a county's or municipality's acquisition or maintenance of a highway or bridge is foreign to the question of the county's or municipality's liability for injuries resulting to persons from the negligent maintenance of such highway or bridge. In the comparatively early case of *Taake v. Seattle,* 16 Wash. 90, 47 Pac. 220, the city sought to

avoid liability for injuries resulting from a defective street maintained by it as such, upon the theory that it had not legally acquired the right to maintain such street at the place in question. Answering this contention, Judge Dunbar, speaking for the court, said:

"It is not a defense to this action, even if it be conceded that the city had no authority to lay out this street. The right of the party injured to obtain redress does not depend upon the technical rights of a city to maintain a street. If, as a matter of fact, this street was laid out by the city of Seattle, was used by it as a street, and the public were invited to use it as such, it becomes its duty to maintain it in proper repair, and to protect the life and limb of those whom it invites to travel upon it, and the ordinary traveler is not called upon to examine the technical legality of the proceedings of the city in opening or laying out the street; so that the question in this case is, was there testimony tending to show the user by the public, at the instance or invitation of the city, of the street at the place where this hole was left unguarded, and where the alleged injuries were sustained."

In *Wendel v. Spokane County*, 27 Wash. 121, 67 Pac. 576, 91 Am. St. 825, a similar claim was made in behalf of the county seeking to avoid its liability for personal injuries caused by work which was being carried on by the county in connection with the improvement of one of its highways; the particular act causing the injury being claimed to be exercised without legal authority. Judge Dunbar again, in answering such contention, speaking for the court, said:

"In discussing the liability of municipal corporations for acts committed by their officers which are defended on the ground of the same being *ultra vires,* we must not lose sight of the distinction which exists between acts which are absolutely *ultra vires* by reason of the corporation having no authority to act on the subject-matter—it being wholly beyond the scope of its powers—and those acts which in a sense are

termed *ultra vires,* where the body has jurisdiction of the subject-matter, but, in the execution of its authority, trespasses upon the rights of others. In the first instance it is conceded by all authority that the corporation is not liable, and in the second, by almost universal modern authority, that it is; that the wrongful act may be the foundation of an action for damages against the corporation, and that such action will lie against the corporation either when the act is done by its officers under its authority or has been ratified by it. Keeping these distinctions in view, it is not difficult to determine that the action will lie in this case if the allegations of the complaint are true; for the action of the county in this respect was not in reference to a matter which was entirely without its authority and scope. On the contrary, it was acting upon a subject especially relegated to its management and control by the laws of the state.''

This view of the liability of a county or city under such circumstances, is adhered to in *Collensworth v. New Whatcom,* 16 Wash. 224, 47 Pac. 439, and *Davis v. Wenatchee,* 86 Wash. 13, 149 Pac. 337.

We have not overlooked § 6521, Rem. Comp. Stat. [P. C. § 535], giving to county commissioners power to make rules and regulations looking to the protection of bridges within their several counties, but providing that such power shall not be construed to extend to bridges located within the limits of an incorporated town; which was enacted in 1860. It seems to us easy to see that the later legislation above quoted modifies that section to the extent of allowing cities and counties joint control over bridges such as is here drawn in question. Nor have we overlooked § 4056, Rem. Comp. Stat. [P. C. § 1664], specifying generally the powers of county commissioners with respect to roads and highways, and seemingly in general terms limiting their powers to roads and highways outside the limits of cities and towns, which section was enacted before

and became embodied in the code of 1881. Again, we say it is easy to see that the more recent legislation above quoted modifies those provisions in so far as the joint acquiring, management and control of bridges such as is here drawn in question are concerned. Nor have we overlooked § 9127, Rem. Comp. Stat. [P. C. § 797], relating to the general powers of cities of the third class, to which class Kelso belongs, enacted in 1915 (Laws of 1915, p. 655), in which we find nothing that militates against the giving of full force and effect to the act of 1913, above quoted, especially empowering cities and counties to jointly acquire, maintain and control bridges such as is here drawn in question.

Nor have we overlooked Rem. Comp. Stat., §§ 6413 to 6416 [P. C. §§ 6051, 6054] inclusive, enacted in 1915 and 1917, relating to the levy and expenditure of revenues for the construction and maintenance of roads and bridges, and providing for the apportionment of such revenues in a measure to cities and towns to be expended by them instead of by the county, in which we see nothing persuasive as against the giving of full force and effect to the provisions of the statute above quoted, especially conferring upon cities and counties the power to jointly acquire, maintain and control bridges such as is here drawn in question. These last noticed sections might possibly be invoked to show some irregularity on the part of the county in the financing of the reconstruction or maintenance of the bridge in question, yet under the rule of the decisions above quoted and cited, that is foreign to the question of the county's being rendered liable for injuries resulting from its negligence in the actual maintenance and control of this bridge as a part of the public highway system of the county for the benefit of all of the people of the county. In its last analysis,

this is not a question of the regularity of the procedure by which the county either acquired, reconstructed or maintained this bridge. The fact remains that the county physically acquired it and has for years immediately preceding its collapse causing Mr. Barr's death, physically maintained and controlled it. The county, we think, clearly had power to do all of this, in any event after the passage of the act of 1913, after which the negligence alleged to be the real cause of Mr. Barr's death occurred. This is enough to render the county liable. We hold, therefore, that the allegations of Mrs. Barr's complaint state a cause of action as against the county, and that the trial court fell into error in sustaining the county's demurrer to her complaint.

The judgment of dismissal is reversed and the cause remanded to the superior court with directions to overrule the county's demurrer, and for such further proceedings as shall be consistent with the views herein expressed.

MAIN, C. J., FULLERTON, BRIDGES, TOLMAN, and PEMBERTON, JJ., concur.

MITCHELL, J. (dissenting)—We are unable to concur in the opinion and judgment of the court. Any action whatever on the part of the county, by attempted contract with the city, by continued practice, or for any other show of reason to maintain or operate the bridge was altogether beyond its power. In such cases the rule is well stated in that portion of *Wendel v. Spokane County*, 27 Wash. 121, 67 Pac. 676, 91 Am. St. 825, quoted in the majority opinion, which we take occasion to repeat, as follows:

"In discussing the liability of municipal corporations for acts committed by their officers which are defended on the ground of the same being *ultra vires,*

we must not lose sight of the distinction which exists between acts which are absolutely *ultra vires* by reason of the corporation having no authority to act on the subject-matter—it being wholly beyond the scope of its powers—and those acts which in a sense are termed *ultra vires,* where the body has jurisdiction of the subject-matter, but, in the execution of its authority, trespasses upon the rights of others. In the first instance it is conceded by all authority that the corporation is not liable, and in the second, by almost universal modern authority, that it is; . . ."

See, also, Dillon, Municipal Corporations (5th ed.), vol. 4, p. 2868.

The same is true as to torts or wrongful acts not resting upon contract. Dillon, Municipal Corporations (5th ed.), vol. 4, § 1649, p. 2871.

One other general and uniform rule is that in the absence of specific authority to the contrary from the law-making power two municipal corporations cannot have jurisdiction and control at one time of the same subject-matter in the same territory.

The case of *Taake v. Seattle,* 16 Wash. 90, 47 Pac. 220, is not in point. That case involved liability of a city for a defective street not owned but maintained by the city, the maintenance of streets and highways being among the general powers of the city, and held out to the public as a public street and highway. Under all the authorities a city under such circumstances would be held so liable.

As we read the opinion the court seeks to justify its judgment and conclusion by reference to certain statutes of 1901 and subsequent years and an interpretation of them which seems to us to be unwarranted. The decision rests in part on § 6516, Rem. Comp. Stat. [P. C. § 534], ch. 70, Laws of 1901, p. 120, as amended by the Laws of 1909, p. 229, as follows:

"Any county within the state of Washington, by and through its county commissioners, and any city or town, by and through its legislative body [and the state of Washington], or any two of such bodies, be, and they are hereby authorized to join in paying for the construction of any bridge, trestle, or any structure which crosses any stream or body of water, when such bridge is a connection between any street or county road, or is a connection between any streets that form connections with county roads, when such stream or body of water is within or partly within such city or town: . . ."

That statute, in our opinion, has no application here other than to show that the legislature recognized the general rule that it was necessary to confer power upon a county to join in paying for the construction of a bridge or structure across a stream or body of water lying within or partly within a city in order that the county might have and exercise such power. Otherwise it is not helpful here because it has to do with the paying for a bridge, which is a very different thing from conferring power on a county to maintain, control and operate a bridge or structure across any stream or body of water lying within or partly within a city. But, it is argued that, if that law were insufficient to confer the power to maintain and operate in such cases, the matter was set at rest in favor of that power by ch. 56, Laws of 1913, p. 168 (Rem. Comp. Stat., § 6524). In our opinion that act has no application to this case. Section 1 of it may be quoted. It reads as follows:

"The state of Washington and all counties, cities or towns within the state are hereby authorized and empowered to join with each other or to aid the state of Washington, the federal government, or any adjoining county, city or town in this state, or to jointly or separately join with any adjoining state, county, city or town in the purchase, construction, control,

operation and maintenance of any bridge or bridges over or across any river, stream or body of water being within or constituting the boundary line of the state or of any county therein.''

That is a general law which was passed primarily to authorize the bridging of the Columbia river at Vancouver, but sufficient, of course, for all other interstate bridges, and to cover other situations where a stream or other body of water to be bridged constitutes a boundary line between counties whether all or only a part of the river, stream or body of water is situate in one county. To make that section applicable to the situation at Kelso it would be necessary for the purpose of so construing it to add to the language of the section the words ''or being within the territorial limits of any city within this state.'' Such words the legislature studiously avoided using, in keeping with its prior uniform course of leaving maintenance and control of all bridges and highways within the limits of cities under the undivided control of city authorities, and in harmony with the subsequent act of 1915 (Laws of 1915, p. 545) Rem. Comp. Stat., § 6413 [P. C. § 6051], upon the subject of levy by county commissioners of taxes for road and bridge purposes, subdivision (b) providing that the county treasurer of each county shall remit to the city or town treasurer of each incorporated city or town within the county fifteen per cent of all money collected, etc.

We are unable to see anything in § 6535, Rem. Comp. Stat. [P. C. § 548], being § 11 of the Laws of 1913, p. 173, that covers the situation at Kelso or that in any way broadens the scope of the act relative to places for the construction of bridges. That section simply provides, in detail, that in constructing a bridge, that is, a bridge to be located as already defined by the act, the city and county authorities shall agree

as to the amount each shall contribute, enter into a contract for the construction of it, spend public funds thereon and if necessary may bond the county and city, etc. We think the judgment of the trial court was correct and that it should be affirmed.

HOLCOMB, J., concurs with MITCHELL, J.